# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT TURNER** | : | |
| Plaintiff | : | |
| v. | : | 3:10-CV-814 |
| | : | (JUDGE MARIANI) |
| **LUZERNE COUNTY**, et al., | : | |
| Defendants | : | |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Robert Turner sued Defendants Luzerne County, Luzerne County Prison Board, Warden Gene Fischi, Deputy Warden Samuel Hyder, Board President Wister Yuhas, Robert Payne, Maryanne Petrilla, Gregory Skrepenak, and Stephen Urban, claiming that they terminated his employment at Luzerne County Correctional Facility ("LCCF") in retaliation for his political affiliation with Commissioner Petrilla. Before the Court is Defendants' Motion for Summary Judgment (Doc. 51) on Plaintiff's claim for First Amendment Retaliation. For the reasons that follow, the Court will grant Defendants' motion.

At the outset, the Court notes that the following statement of undisputed facts focuses on what various people *said* during interviews and in reports, not necessarily what actually happened in the underlying investigation into Plaintiff's actions as a lieutenant. The issue before the Court is what information the Luzerne County Prison Board considered

when it decided to terminate Plaintiff's employment. Regardless of whether the allegations against Plaintiff were true (a matter not before this Court), the inquiry here is whether Defendants relied on reports of Plaintiff's sexual misconduct with other prison staff members and female inmates, knew these allegations to be false, and terminated Plaintiff anyway; that is, whether Defendants used the allegations against Plaintiff as a pretext for terminating his employment or whether they had legitimate, non-retaliatory reasons for terminating his employment.

## II. Statement of Undisputed Facts

In May 2008, Plaintiff was employed as a Lieutenant at LCCF. (Complaint, Doc. 1, at ¶¶ 21-22). Deputy Warden Samuel Hyder and Warden Fischi described Plaintiff's performance as "good" or "excellent." (Hyder Dep., Doc. 54, Ex. 2, 31:11-16; Fischi Dep., Doc. 54, Ex. 26, 33:2-4). Major Larson also described Plaintiff as a "good Lieutenant." (Larson Dep., Doc. 55, Ex. 2, 16:5-18). Deputy Warden Hyder was aware of Plaintiff's political activities in support of Commissioner Petrilla. (Hyder Dep. at 28:16-18). Hyder was a political supporter of Commissioner Skrepenak, a political adversary of Commissioner Petrilla. (*Id.* at 17:18-21).

On May 5, 2008, Corrections Officer ("CO") Angela Sweet reported to Deputy Warden Hyder that on May 3rd, Plaintiff had sexually harassed her. (May 16, 2008 Hyder Report, Doc. 54, Ex. 1, at 1; Hyder Dep., at 33:18-34:19; May 5, 2008 Sweet Statement, Doc. 54, Ex. 4). If such allegations were true, Turner's actions would violate LCCF policies.

2

The Luzerne County Personnel Policy prohibits sexual harassment by an employee. (Doc. 54, Ex. 30, at 7).

During that conversation, Sweet informed Hyder that CO Mark Weiss had told her that Plaintiff had questioned him (Weiss) about whether Weiss and Sweet were having an affair and had made vulgar references to Corporal Bradley Mrochko's genitalia. (Sweet Dep., Doc. 54, Ex. 3, at 37:7-23, Sweet Statement, at 1, May 5, 2008 Weiss Statement, Doc. 54, Ex. 5, at 2; May 11, 2008 Weiss Harassment Complaint, Doc. 54, Ex. 6, at 1; Riggs Dep., Doc. 54, Ex. 9, 37:1-4; Weiss Dep., Doc. 55, Ex. 9, at 20:2-6).[1]

Sweet also told Hyder that on May 3rd, Plaintiff asked Sweet if she were interested in women sexually and whether she was interested in having a "threesome" with Plaintiff and another woman. (Sweet Dep., at 90:1-8, 91:5-25, 92:10-25, 98:11-99:2; Sweet Statement; May 12, 2008 Sweet Harassment Complaint, Doc. 54, Ex. 8, at 1; Riggs Dep., at 10:22-11:18, 12:1-5, 16:16-24, 19:2-6; May 8, 2008 Riggs Statement, Doc. 54, Ex. 10, at 2).

During that same encounter, Plaintiff allegedly told Sweet it was his birthday and tried to hug her. (Sweet Dep., at 89:13-20, 91:5-9; 92:10-16; Sweet Statement, at 2; Sweet Harassment Complaint, at 1; Riggs Dep. at 13:16-18, 15:3-4, 18:10-15; Riggs Statement, at 2; May 6, 2008 Mrochko Statement, Doc. 54, Ex. 11, at 1). Sweet also alleged that in the lieutenant's office, Plaintiff repeatedly asked her to "give him a chance," and when other

---

[1] Ultimately, Sweet, Weiss, and CO Leah Beckley filed sexual harassment complaints against Plaintiff. (Sweet, Doc. 54, Ex. 8, Weiss, Doc. 54, Ex. 6, Beckley, Doc. 54, Ex. 15).

3

people were present, he made it a joking matter to humiliate her. (Sweet Dep. at 82:7-83:18; Sweet Statement, at 1).

Later that day, when Plaintiff, Sweet, and Corporal Mrochko were in Plaintiff's office, Plaintiff allegedly told Sweet that he had previously asked Mrochko, who was the father of Sweet's child, whether Sweet was "good in bed" and he then disparaged Mrochko as a father in Mrochko's presence. (Sweet Dep. at 99:14-100:3; Sweet Statement, at 2; Riggs Statement, at 1-2; Mrochko Statement, at 2).

Based on Sweets' statements to him, Deputy Warden Hyder began an investigation into Plaintiff's conduct. (Hyder Report, at 1-2). The investigation yielded evidence of more inappropriate conduct by Plaintiff towards Correctional Officer Leah Beckley and several female inmates.

For instance, after speaking with Sweet and Weiss, Hyder interviewed CO David Rappaport who reported that one year prior to Sweet's complaint, he (Rappaport) had observed Plaintiff make a pelvic thrusting motion towards the back of Beckley's head and continue doing so even after Beckley turned around and faced Plaintiff. (Hyder Report, at 1; Beckley Dep., Doc. 54, Ex. 13, at 22:8-23:5, 24:18-26:25; May 5, 2008 Beckley Statement, Doc. 54, Ex. 14, at 1; May 12, 2008 Beckley Harassment Complaint, Doc. 54, Ex. 15, at 1; Rappaport Dep., Doc. 54, Ex. 16, at 19:11-28:17; May 6, 2008 Rappaport Statement, Doc. 54, Ex. 17).

4

In her telephone interview on May 5th, Beckley confirmed Rappaport's statements and added in her report that she had witnessed Plaintiff have closed-door meetings with female inmates on numerous occasions, sometimes lasting as long as forty-five minutes. (Beckley Statement, at 1). In one instance, Plaintiff had instructed Beckley to announce that when he called for a particular female inmate, Beckley should announce that the inmate was going to see the chaplain. According to Beckley, the inmate then stated, "we use that excuse to[o] much." (*Id.*). The LCCF Code of Ethics prohibits fraternization between employees and inmates. (Doc. 54, Ex. 29, ¶ B.6).

At this point in the investigation, Hyder informed Warden Fischi of the allegations against Plaintiff, and Fischi advised him to get in touch immediately with the President of the Board, Defendant Yuhas, and Human Resources. (Hyder Report, at 2; Hyder Dep. at 65:14-66:1). Yuhas, Human Resources Director Doug Richards, and Attorney Blaum advised Hyder to remove Plaintiff from work until the investigation was complete. (*Id.* at 67:6-11). Hyder contacted Fischi, Richards, and Blaum "because at that point from the very beginning they were the ones who directed [him]." (*Id.* at 65:5-12).

Commissioner Petrilla testified that Plaintiff's employment issue first came to her attention in 2008 when HR Director Richards told the prison board in executive session about the sexual harassment complaint against Plaintiff. (Petrilla Dep., Doc. 54, Ex. 27, at 28:6-29:3). Upon hearing this report from Richards, the Board instructed Hyder to do a "thorough investigation and report back" to the Board. (*Id.* at 30:6-11).

Hyder then interviewed Corporal Mrochko on May 6th, followed by CO Paul Riggs on the 8th. Mrochko corroborated what Sweet had told Hyder, and he further stated that Plaintiff inquired about other aspects of Mrochko's sexual relationship with Sweet. For instance, when Mrochko was watching their daughter, Plaintiff opined that Sweet was "probably out f*cking like a mink." (Mrochko Statement, at 2).

In his report to Hyder, CO Riggs, union steward, confirmed that Plaintiff had made a remark about Mrochko's genitalia and that a conversation regarding a threesome had taken place. He stated that Sweet's response to Plaintiff's invitation to a threesome was "[i]t depends on who it is," and she would be interested if she were "drunk enough." (Riggs Dep., Doc. 54, Ex. 9, 37:1-4; Riggs Statement, at 2).[2] He later testified in his deposition that Weiss was "laughing it up" during the conversation regarding himself and Sweet. (Riggs Dep. at 35:19-21, 37:11-13). Riggs further testified that sexual conversations were not unusual in the prison. (*Id.* at 17:14-18). He also stated that Sweet willingly participated in the conversation about the threesome and "she was laughing." (*Id.* at 19:2-6).

Hyder next interviewed Corporal Anthony Piontkowski on the 8th, who stated that he had observed Plaintiff give extended phone calls "from 1/2 hr. up to 2 hrs." to female inmates[3] on numerous occasions "without any guard present and the shades pulled down." (Hyder Report, at 2-3; May 8, 2008 Piontkowski Statement, Doc. 54, Ex. 18).

---

[2] When Hyder asked Riggs for his account of what had happened, Riggs explained, "[t]hey were talking, and there was no physicality like that. . . . it was sexual talk but nothing that I would be alarmed about or feel that there would need to be reports." (Riggs Dep. at 29:4-13). According to Riggs, Hyder seemed upset that Riggs's version of events did not match Sweet's or Weiss's versions exactly. (*Id.* at 46:21-48:22).

[3] Natalie Thomas and Altreesha Williams

Hyder then interviewed CO Christine Ford on the 8th (Hyder Report, at 3), who revealed that she, too, had witnessed Plaintiff engage in inappropriate behavior with female inmates. In particular, Plaintiff had instructed Ford to leave Plaintiff's office and shut the door behind her after she escorted a female inmate there. According to Ford, the blinds were always drawn, the female inmates remained alone with Plaintiff for up to forty minutes at a time, and she had often seen Plaintiff sitting with his legs spread and his hand near his pelvis area when he was speaking to female inmates. (May 8, 2008 Ford Statement, Doc. 54, Ex. 20, at 1-2). Additionally, after one forty-minute long visit to Plaintiff's office, one female inmate (Polachek) received the comments "wipe the white stuff from around your mouth," and "what's Turner going to do for you?" from another inmate. Polachek responded, "He's going to give me half time." (*Id.* at 1-2). Ford observed a small group of female inmates receive preferential treatment in the form of phone calls every day; on one occasion, one inmate complained that her phone call had not gone through, and Plaintiff winked in response to a request for another phone call the following day. (*Id.* at 2). Finally, she once heard Plaintiff request over the loudspeaker for a particular female inmate to lift her shirt to show her chest, and the inmate complied. (*Id.* at 3).

Deputy Warden Hyder then interviewed CO Melissa Ritsick on May 12th (Hyder Report at 3), who said that she, too, had witnessed several female inmates receive preferential treatment in the form of phone calls lasting longer than their allotted time. (May 12, 2008 Ritsick Statement, Doc. 54, Ex. 22). Plaintiff instructed Ritsick to retrieve female

7

inmates[4] to his office and to say it was for a phone call. (*Id.* at 1). Ritsick also confirmed Ford's statement that Plaintiff requested over the loudspeaker that certain inmates (Yvette Davis) expose themselves to him. (*Id.* at 2).

On the 14th, Hyder interviewed Sergeant Daniel Baluta, who responded that on many occasions, especially weekends, he witnessed Plaintiff call female inmates into his office behind closed doors for periods of time lasting above an hour. (Hyder Report, at 3;, Doc. 54, Ex. 23).

After completing his investigation, Deputy Warden Hyder submitted his report to Warden Gene Fischi, who informed Plaintiff in a letter dated July 10, 2008, that he intended to recommend Plaintiff's termination to the LCCF Board. (Doc. 54, Ex. 25; Fischi Dep., at 40:1-6). Hyder attached to his findings reports from CO Sweet (Ex. 1), CO Weiss (Ex. 2), CO Rappaport (Ex. 3), CO Beckley (Ex. 4), Corporal Mrochko (Ex. 5), CO Riggs (Exs. 6, 7),[5] Corporal Piontkowski (Ex. 8), CO Ford (Ex. 9), CO Ritsick (Ex. 10), Sergeant Baluta (Ex. 11), CO Michael Beckley (Ex. 12), Sergeant Chonka (Ex. 13), and Sexual Harassment Complaints against Plaintiff from COs Sweet, Weiss, and Beckley (Exs. 14-16). Fischi testified that his recommendation was based on Hyder's report, the solicitor's recommendation and HR Director Richards's advice. (Fischi Dep. at 40:4-21).

---

[4] Janice Seay, Lisa Judo, Yvette Davis, Corinne Davis, Monica August, Altreesha Williams, Natalie Thomas

[5] Plaintiff has submitted evidence that the Riggs Statements may not have been attached to the report which the Board reviewed. (Hyder Dep. 50:3-52:12) (although Hyder received reports from CO Riggs, he could not "be a hundred percent sure" that he attached them to the final report).

8

Commissioner Petrilla testified that although she did not have confidence in Hyder's ability to do a thorough investigation because she did not "have a very good trust factor with" him (Petrilla Dep. at 31:4-12), she trusted HR Director Richards to investigate the complaints against Plaintiff independently of Hyder. (*Id.* at 32:20-25). Petrilla recalled that Richards told her that "[a]t first it was the inappropriate contact with the – with the other guard. It wasn't contact, it was a gesture. And the statement that Mr. Turner made to a different guard. And then as questions were being asked, the evidence or accusations of him going into private offices with prisoners came out." (*Id.* at 33:10-18). Petrilla testified, "I would think that asking someone about the size of another person's anatomy is completely offensive. I would think putting your crotch in a person's head is extremely offensive. And I would think taking a female prisoner out of a cell is extremely offensive." (*Id.* at 46:23-47:3). To Petrilla, "[a]ny one or all [three] together," would have been serious enough to warrant termination. (*Id.* at 47:4-8). Petrilla admitted to knowing Beckley because Beckley's mother and Petrilla were acquaintances of mutual friends. (*Id.* at 34:25-35:13). Petrilla then stated that she voted to terminate Plaintiff's employment because she "talk[ed] with the girl's [Beckley's] mother," believed Hyder's report, and trusted what Richards had told her. (*Id.* at 37:16-39:17).

Commissioner Urban corroborated Petrilla's version of events. "We were briefed in an executive session about Mr. Turner's conduct by Mr. Hyder. . . . Mr. Hyder went over information that was provided to him in the form of written statements by several of the

corrections officers in the facility. Based upon that investigation, I made my decision to – I think I seconded the motion to terminate him [after Commissioner Skrepenak moved for termination]." (Urban Dep., Doc. 54, Ex. 28, at 6:14-25).

> Mr. Hyder had received information from a CO named Sweet about . . . Mr. Turner making some inappropriate comments to her, sexual comments to her, that I thought were totally out of line and unprofessional. And also Mr. Hyder then conducted further investigation by talking to other COs of the facility and he collected probably about seven or eight statements from different corrections officers regarding Mr. Turner's conduct. Not only conduct toward COs, but also towards inmates.

(*Id.* at 7:15-8:2). The inappropriate conduct directed towards inmates was "[f]avoritism, taking inmates into his office at different periods of time, outside, providing special favors and treatments. There was also information provided to us that Mr. Turner . . . had said over the loudspeaker for the inmates to basically lift up their tops." (*Id.* at 8:3-10). Urban did not think a lesser sanction was warranted because

> [i]t wasn't just one statement, it was multiple statements in the information presented to us. He was an officer in the prison. Officers, in my opinion, are always held to a higher standard. . . . And me, I would support termination with that type of conduct. Not only with the COs, but with the inmates.

(*Id.* at 12:14-13:3).

On July 14, 2008, based on Warden Fischi's recommendation and Hyder's report, the Board voted to terminate Plaintiff's employment. (Fischi Dep., at 40:4-20; Petrilla Dep. at 36:2-41:14; Urban Dep. at 6:14-25). Plaintiff received a letter in the mail on July 16, 2008 advising him of his termination. (Turner Dep. at 44:16-18).

In hindsight, Defendant Hyder testified that, at most, Plaintiff should have been suspended or reprimanded, not terminated. (Hyder Dep. 69:11-70:1). In fact, Hyder himself was terminated allegedly due to budget cuts, but he believed his termination was based on "political motivation" because both Commissioners Urban and Petrilla disliked him. (*Id.* at 10:14-17, 16:2-17:25). Hyder testified that Defendant Petrilla once told him he had done a good job with the investigation and "Leah Beckley was like a daughter to her, and they grew up by each other. They're all - - she's known her her whole life and that she - - Lieutenant Turner has tried to contact her, but she would have no dealings with him." (*Id.* at 80:12-25).

During his deposition, Plaintiff said that Rappaport's report about the alleged incident with Beckley was incorrect because Rappaport wanted to "[g]o along with Angela Sweet." (*Id.* at 83:10-22). Turner also said Ford had a problem with him because "she goes out and she associates with Angela Sweet. They drink at a bar together." (*Id.* at 85:3-9).

### III. Analysis

#### a. Standard on Motion for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

### b. Discussion

#### i. Has Plaintiff established a prima facie case?

Plaintiff argues that Defendants Fischi and Hyder, supporters of Commissioner Gregory Skrepenak, orchestrated his termination from employment with the LCCF in retaliation for Plaintiff's public support for Commissioner Maryanne Petrilla, a political adversary of Commissioner Gregory Skrepenak. Defendants argue that they terminated Plaintiff's employment because their investigation yielded evidence of Plaintiff's inappropriate behavior with female inmates and other staff on numerous occasions. Plaintiff retorts that Defendants' proffered reason is pretextual.

Under a political patronage theory, Plaintiff must show that (1) he was employed at a public agency in a position that does not require political affiliation, (2) he was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating

factor in Defendants' decision to terminate his employment. *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). Implicit within the third prong "are two requirements; a plaintiff must produce evidence to show that defendants had knowledge of his political affiliation in addition to demonstrating causation." *Wheeler v. Twp. of Edison*, 326 F. App'x 118, 121-22 (citing *Stephens v. Kerrigan*, 122 F.3d 171, 177-180 (3d Cir. 1997) (incorporating Title VII burden-shifting standard in § 1983 cases)). "Once the plaintiff establishes a *prima facie* case, the defendant[s] may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Smith v. City of Allentown*, 589 F.3d 684, 692-93 (3d Cir. 2009) (internal citations and quotation marks omitted). If the defendants articulate a non-discriminatory reason for Plaintiff's termination, Plaintiff

> generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to find that discrimination was more likely than not a motivating or determinative cause of termination.

*Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765.

Defendants concede that Plaintiff has established the first two elements of his *prima facie* case: that his position as a lieutenant at LCCF did not require political affiliation and he

13

engaged in protected activity by openly supporting Commissioner Petrilla during her election in 2007. (Doc. 52, at 9; Petrilla Dep. at 5:24-6:3). They contest, however, the existence of a causal link between Plaintiff's activity and his subsequent termination. Instead, they argue that their decision to terminate Plaintiff's employment was based solely on the numerous reports of impropriety by Plaintiff in relation to other staff and female inmates.

The only defendant Plaintiff has shown was aware of Plaintiff's political activities in support of Commissioner Petrilla was Deputy Warden Hyder. (Hyder Dep. at 28:16-18). Hyder admits that he was a political supporter of Commissioner Skrepenak, a political adversary of Commissioner Petrilla. (*Id.* at 17:18-21). Taking all factual inferences in Plaintiff's favor, the Court will assume that Hyder was motivated by political retaliation for initiating the investigation and bringing it to Warden Fischi's and the Board's attention. However, Plaintiff's evidence goes no farther than that. Plaintiff has submitted no evidence that any of the Board members, the decision-makers who voted to terminate him, were aware of his political affiliation with Commissioner Petrilla, and so, Plaintiff has not made out a *prima facie* case of First Amendment retaliation. See *Wheeler*, 326 F. App'x at 121-22.

In addition, as the Court will discuss further below, Plaintiff has not made out a *prima facie* case against Commissioner Petrilla for First Amendment retaliation where a necessary element of that claim is lacking; that is, Plaintiff must show that his support for Commissioner Petrilla was the retaliatory cause of his termination. That claim cannot stand where the record evidence shows that Petrilla herself voted to terminate Plaintiff for the

14

reasons presented in the report to the Prison Board. Despite the above analysis and conclusions, the Court will address the issue of whether Defendants' proffered reasons for terminating Plaintiff were pretextual.

### ii. Defendants' proffered reasons for terminating Plaintiff's employment

In support of Defendants' proffered reasons for terminating Plaintiff's employment, Defendants cite to numerous witnesses who cited several instances of Plaintiff's inappropriate behavior.

To refute many of Defendants' statement of facts, Plaintiff relies heavily on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). There, the Supreme Court said, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (internal citations and quotation marks omitted).

Under Plaintiff's argument, the Court cannot consider *any* statements from interested witnesses when evaluating a motion for summary judgment. Taking this argument to its logical conclusion, a court could never consider a defendant's deposition or affidavit because he is an interested party, rendering discovery of a defendant's testimony useless for summary judgment purposes. This takes *Reeves* too far, and this is exactly what the

Third Circuit stated in *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) ("[t]he fact is that in considering a motion for summary judgment the court should believe *uncontradicted* testimony unless it is inherently implausible *even if the testimony is that of an interested witness*.") (emphasis added).

Finally, the Court notes that Plaintiff's interpretation of *Reeves* already has been rejected by another federal district court. The Eastern District of Pennsylvania so held in another case in which the plaintiff was represented by the same counsel as Turner is here. *Murphy v. Radnor Twp.*, -- F. Supp. 2d --, 2012 WL 5400084, at *6 (Nov. 6, 2012 E.D. Pa. 2012).

Nonetheless, the Court will not accept as true the statements of Sweet and Beckley, other than to accept that they made these statements to Hyder because the focus of the Court's inquiry is whether Hyder reasonably believed their statements were true. As such, many of Plaintiff's arguments that Sweet and Beckley were not credible fall by the wayside.[6]

Plaintiff argues that Hyder should not have believed Sweet's report of harassment, based on Sweet's previous misconduct in abusing her sick leave[7] and her status as an

---

[6] For instance, Hyder testified that he found out about the alleged incident between Beckley and Plaintiff through Sweet. (Hyder Dep. at 45:5-46:25). However, this incident was not in Sweet's report, and Sweet testified at her deposition that she had not approached Beckley to discuss either her own claim against Plaintiff or Beckley's claims against Plaintiff before she (Sweet) reported to Hyder. (Sweet Dep. at 35:3-23; 36:3-10; 37:1-2; 39:15-24; 46:3-15; 47:4-13) ("I still to this day don't know what happened. I know she had an incident. And that was it." *Id.* at 45:22-24).

[7] Hyder testified that he had been unaware that Plaintiff had written Sweet up in 2006 for using sick time she did not have, but if he had been aware, the knowledge would not have reduced her credibility in his eyes. (*Id.* at 71:2-72:12). Based on Plaintiff's write-up, Major Larson had suspended Sweet for abusing sick time in January 2007 and also for failure to perform a security function (Larson Dep. at 19:24-20:11, 21:5-11; *see also* Two-Day Suspension Letter, Doc. 55, Ex. 7). Hyder had been aware that Larson had found Sweet had falsified a report at the time Sweet complained about Turner, yet Hyder testified that this did not affect his estimation of her credibility. (Hyder Dep. at 74:22-75:6). Hyder admitted that he did not inform the Board about Larson's report of Sweet, but he

16

inmate at Lackawanna County Prison, all of which would impair her credibility. However, Sweet's status as an inmate at Lackawanna County Correctional Facility has no bearing on whether Hyder should have believed her report because her stay at Lackawanna County occurred after the events giving rise to Turner's termination and could not have been known to Hyder at the time he created his report. Sweet was incarcerated at Lackawanna County twice: once for being late reporting to probation and once for failing to obey a subpoena and court order in this case. (Sweet Dep. at 60:16-61:17).

Plaintiff takes issue with Hyder's investigation, arguing that Hyder should have corroborated the allegations of improper behavior with inmates, that he should have highlighted the discrepancies between Sweet's and Beckley's statements in his report, and that he should have included impeachment evidence (Sweet's prior misconducts) and exculpatory evidence (Plaintiff's denials) in his report, including the potentially missing Riggs Statements. (Hyder Dep. 50:3-52:12).

The Court notes that Hyder did not rely solely on the Sweet and Beckley Statements in his report; they were merely the starting point of his investigation. After receiving Sweet's initial report and statements from COs Weiss, Rappaport, and Beckley, Hyder informed the Warden and the Board about the situation and was instructed to conduct a full investigation. (*Id.* at 65:14-66:1, 67:6-11; Hyder Report, at 2). Further inquiry led to further statements

---

also was unsure whether Human Resources or Attorney Blaum might have brought it to the Board's attention. (*Id.* at 76:18-24). Larson recommended to Fischi that Sweet be terminated for her misconduct. (*Id.* at 77:10-15). Furthermore, Riggs's statements did not fully corroborate Sweet's version of events, because Riggs's recollection was that Sweet's response to Plaintiff's invitation to a threesome was "[i]t depends on who it is," and she would be interested if she were "drunk enough." (Hyder Dep. at 52:10-53:9; Riggs Statement, at 2).

17

from other COs of Plaintiff's allegedly wrongful conduct. (Hyder Report, at 2-3). In addition, if Hyder had done nothing in response to Sweet's report, he would have exposed himself and the LCCF to liability for ignoring a potentially legitimate report of sexual harassment.[8] Hyder was obligated to act on a report of sexual harassment.

Hyder's investigation led to interviews with Corporal Mrochko, CO Riggs,[9] Corporal Piontkowski, CO Ford, CO Ritsick, and Sergeant Baluta. The substance of these interviews was contained within Hyder's report to Warden Fischi. Therefore, disregarding all of the testimony from Sweet and Beckley (including Corporal Mrochko with whom Sweet has a child and CO Weiss whose credibility Plaintiff has also attacked), the Board was still faced with the testimony of disinterested witnesses (Rappaport, Piontkowski, Ford, Ritsick, and Baluta) that Plaintiff engaged in inappropriate behavior with female inmates and staff on repeated occasions.[10] There is nothing in the record to indicate that the Board should have mistrusted or discredited the disinterested statements of Rappaport, Piontkowski, Ford, Ritsick, and Baluta which reported that Plaintiff made an inappropriate sexual gesture toward CO Beckley, asked female inmates to expose themselves to him, often spent extended periods of time in his office alone with female inmates behind closed doors and with blinds drawn, and female inmates commented about the preferential treatment they

---

[8] In fact, Sweet and Beckley later pursued action against LCCF for Turner's alleged actions and both women settled their cases. (Sweet Settlement, Doc. 55, Ex. 8; Beckley Dep. at 74:9-14).

[9] If the Board saw the Riggs statement, it would have seen that Riggs corroborated Sweet's allegation that Plaintiff invited her to participate in a threesome and tried to give her a hug because it was his birthday. (May 8, 2008 Riggs Statement, at 1-2).

[10] *See, e.g.*, May 6, 2008 Rappaport Statement, May 8, 2008 Piontkowski Statement, May 8, 2008 Ford Statement, May 12, 2008 Ritsick Statement, May 14, 2008 Baluta Statement.

received from Plaintiff. Therefore, even if the Prison Board had discounted Sweet's, Beckley's, Weiss's and Mrochko's statements and had never seen Riggs's statements, it had ample reasons to find Plaintiff's termination was warranted based on Hyder's report with attached statements from other disinterested COs, Fischi's recommendation, and the recommendations of Solicitor Blaum and HR Director Richards.

Again, the issue in this case is not whether Plaintiff actually engaged in the conduct other staff members accused him of, but whether Deputy Warden Hyder, Warden Fischi, and the Board relied on these reports when deciding to investigate and terminate Plaintiff. Thus, when Plaintiff attempts to controvert his former colleagues' testimony with his own testimony that Rappaport wanted to "[g]o along with Angela Sweet" and that Sweet and Ford were drinking partners,[11] he misses the mark. The investigation into whether or not Plaintiff sexually harassed co-workers and engaged in improper conduct with female inmates is over. Plaintiff's burden at this point is to show that Defendants' proffered reason for his termination is pretextual.

Thus, there is nothing in the record to support Plaintiff's argument that the Prison Board members relied on these statements from Sweet, Beckley, and other COs *knowing that they were false* and terminated his employment anyway. Rather, the undisputed evidence shows that the Prison Board members relied on Hyder's report and attached statements to conclude that termination was warranted. Plaintiff has not "cast[] sufficient

---

[11] (Turner Dep. at 83:10-22, 85:3-9).

doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." *Fuentes*, 32 F.3d at 762. Neither has Plaintiff shown "that discrimination was more likely than not a motivating or determinative cause of termination." *Id*.

Perhaps the only evidence of bias against Plaintiff points to Commissioner Petrilla who stated that her vote in favor of termination was based in part on her conversation with CO Beckley's mother. However, as Plaintiff himself points out, even had Petrilla voted against termination, "Ms. Petrilla's vote would not have saved Mr. Turner." (Doc. 56, at 17). Even assuming that Petrilla's relationship with Beckley did indeed override any loyalty she may have felt towards Plaintiff, such a relationship with Beckley is in no way related to any retaliatory animus Petrilla would have felt towards Plaintiff because he campaigned in *Petrilla's* favor. Therefore, Petrilla's vote to terminate could not have been the basis of a First Amendment retaliation claim.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiff's First Amendment Retaliation claim (Doc. 51) will be granted. A separate Order follows.

/s/ Robert D. Mariani
Robert D. Mariani
United States District Court Judge

20